UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

DEYLIN MARTINEZ-GUERRERO,    :

    :

    *Petitioner,*    :

    :

    - v. -    :    24 CR-154-6 (ER)

    :

UNITED STATES OF AMERICA,    :

    :

    *Respondent.*    :

-------------------------------------------------- X

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO VACATE, SET ASIDE, OR CORRECT SENTENCE UNDER 28 U.S.C. § 2255

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................... 1

JURISDICTION ...................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 1

      A.      Petitioner's Indictment and Arrest ................................................................ 4

      B.      Petitioner's Pre-Plea and Sentencing Representation ............................................. 5

      C.      Petitioner's Plea Agreement and Plea Hearing ........................................................ 7

      D.      Petitioner's Sentencing ................................................................................. 10

GROUNDS FOR RELIEF ..................................................................................................... 12

I.      MR. MARTINEZ-GUERRERO'S COUNSEL WAS CONSTITUTIONALLY
INEFFECTIVE. ............................................................................................................ 12

      A.      Trial Counsel Rendered Constitutionally Ineffective Assistance by
Misadvising Mr. Martinez-Guerrero Regarding the Immigration
Consequences of His Guilty Plea. ............................................................... 13

      B.      Trial Counsel Rendered Constitutionally Ineffective Assistance by Failing
to Secure an Interpreter at All Critical Stages of the Plea and Sentencing
Proceedings. ................................................................................................. 18

      C.      Trial Counsel Rendered Constitutionally Ineffective Assistance by Failing
to Secure Translated Copies of the Plea Agreement and Other Critical
Court Documents .......................................................................................... 23

II.      TRIAL COUNSEL'S CONDUCT PREJUDICED MR. MARTINEZ-
GUERRERO BY PRECLUDING A MORE FAVORABLE PLEA
AGREEMENT OR TRIAL ........................................................................................... 25

PRAYER FOR RELIEF ........................................................................................................ 28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boykin v. Alabama*,
  395 U.S. 238 (1969)................................................................................................20

*Doe v. United States*,
  915 F.3d 905 (2d Cir. 2019)....................................................................................16

*Dusky v. United States*,
  362 U.S. 402 (1960)................................................................................................20

*Farhane v. United States*,
  121 F.4th 353 (2d Cir. 2024) ..................................................................................13

*Gonzalez v. Phillips*,
  195 F. Supp. 2d 893 (E.D. Mich. 2001)............................................................20, 23

*Hill v. Lockhart*,
  474 U.S. 52 (1985)............................................................................................12, 20

*Immigr. & Naturalization Serv. v. St. Cyr*,
  533 U.S. 289 (2001)................................................................................................17

*Kovacs v. United States*,
  744 F.3d 44 (2d Cir. 2014)................................................................................26, 27

*Lee v. United States*,
  582 U.S. 357 (2017)................................................................................................28

*Libretti v. United States*,
  516 U.S. 29 (1995)..................................................................................................13

*Mempa v. Rhay*,
  389 U.S. 128 (1967)................................................................................................20

*Mohamed v. United States*,
  No. 18-cv-11193, 2020 WL 1503073 (S.D.N.Y. Mar. 30, 2020)............................14

*United States ex rel. Negron v. State of N. Y.*,
  434 F.2d 386 (2d Cir. 1970)............................................................19, 20, 22, 23

*North Carolina v. Alford*,
  400 U.S. 25 (1970)..................................................................................................20

*Padilla v. Kentucky*,
  559 U.S. 356 (2010) .................................................................................... *passim*

*Rodriguez v. United States*,
  730 F. App'x 39, 42 (2d Cir. 2018) ...............................................................16

*Sanders v. United States*,
  130 F. Supp. 2d 447 (S.D.N.Y. 2001)............................................................24

*Sosa v. Mohawk Corr. Facility*,
  No. 07-cv5916, 2008 WL 534764 (S.D.N.Y. Feb. 25, 2008)...........................22

*Strickland v. Washington*,
  466 U.S. 668 (1984).................................................................................... *passim*

*Tejeda v. Reno*,
  No. 00-CIV-6338 SAS, 2000 WL 1280969 (S.D.N.Y. Sep. 11, 2000).....................1

*Thomas v. United States*,
  Nos. 19-CV-5675 & 01-CR-579, 2020 WL 3428148 (S.D.N.Y. June 23, 2020)....................16

*United States v. Bhindar*,
  No. 07-cr-711–04, 2010 WL 2633858 (S.D.N.Y. June 30, 2010)...........................18

*United States v. Couto*,
  311 F.3d 179 (2d Cir. 2002)............................................................................16

*United States v. Ferrera*,
  No. 10-CR-892, 2020 WL 7342673 (S.D.N.Y. Dec. 14, 2020) .......................14, 17

*United States v. Guide*,
  891 F.3d 744 (8th Cir. 2018) ..........................................................................24

*United States v. Henry*,
  888 F.3d 589 (2d Cir. 2018)............................................................................19

*United States v. Hernandez*,
  283 F. Supp. 3d 144 (S.D.N.Y. 2018).............................................................28

*United States v. Mosquera*,
  816 F. Supp. 168 (E.D.N.Y. 1993) ................................................................. *passim*

*United States v. Nissim*,
  No. 92-cr-425, 1994 WL 10624 (S.D.N.Y. Jan. 10, 1994)...............................23, 24

*United States v. Sapia*,
  Nos. 02-cv-649 & 199-cr-1193, 2002 WL 620483 (S.D.N.Y. Apr. 18, 2002)........................11

*Whyte v. United States*,
    Nos. 08–cr-1330 & 14–cv–3598, 2015 WL 4660904 (S.D.N.Y. Aug. 6, 2015) ..............18, 26

**Statutes**

18 U.S.C. § 371 ....................................................................................................................4

28 U.S.C. § 1827 ................................................................................................................19

28 U.S.C. § 2255 ................................................................................................................1

**Other Authorities**

3 Bender, Criminal Defense Techniques (1999) ...........................................................17

Vanessa Buschschlüter, Honduras Gang Violence at 'War-Like Levels' – NGO,
    BBC (Apr. 24, 2023), https://perma.cc/9742-TU46 ................................................2

Press Release, Congressman Jesus G. García, Representatives García, Bush,
    Omar, Schakowsky & Bowman Introduce Resolution to Affirm Rights of
    Honduras' Garífuna People (Dec. 14, 2022), https://perma.cc/5HEL-FX4W ..........2

David Gonzalez, Garífuna Immigrants in New York, N.Y. Times (Jul. 24, 2015),
    https://perma.cc/5XNJ-S9QV (last visited Apr. 22, 2026) ......................................2

N. Y. St. Office Indigent Legal Servs., https://perma.cc/N3YC-22L5 (last visited
    Apr. 22, 2026) ..........................................................................................................5

*Padilla Support Center*, Immigr. Def. Project, https://perma.cc/3ZRF-A2XN (last
    visited Apr. 22, 2026) ...............................................................................................5

Fritz Pinnow & Valeria Solis, Beyond Drugs – Gangs' Control Over Urban Areas
    in Honduras, Conta Corriente (July 25, 2024), https://perma.cc/9C3L-PYZU ........2

Press Statement, Marco Rubio, Secretary of State, Terrorist Designation of Barrio
    18 (Sep. 23, 2025), https://perma.cc/3BRQ-E4JK.....................................................2

## PRELIMINARY STATEMENT

Petitioner Deylin Martinez-Guerrero brings this motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, on the grounds that he received ineffective assistance of counsel.  Petitioner respectfully requests that this Court order his immediate release, and, in the interim, issue an order that he not be removed from the Western District of Louisiana or from the United States, pending disposition of his motion.  Petitioner states as follows:

## JURISDICTION

1.     Petitioner Deylin Martinez-Guerrero ("Petitioner," "Mr. Martinez-Guerrero," "Deylin," or "Deyln") is a citizen of Honduras currently detained at Pollock Federal Correctional Institution, located at 1000 Airbase Road, Pollock, Louisiana 71467.

2.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. § 2255, based on Petitioner's underlying conviction and sentencing in the Southern District of New York.  *See* 28 U.S.C. § 2255 ("a prisoner in custody . . . may move *the court which imposed the sentence* to vacate, set aside or correct the sentence") (emphasis added); *see, e.g.*, *Tejeda v. Reno*, No. 00-CIV-6338 SAS, 2000 WL 1280969, at *1 n. 2 (S.D.N.Y. Sep. 11, 2000) ("petitioner was sentenced in the Southern District of New York[, which] support[s] jurisdiction . . . under 28 U.S.C. § 2255").

## FACTUAL BACKGROUND

3.     Mr. Martinez-Guerrero was born in Puerto Cortés, Honduras.  Mr. Martinez-Guerrero did not grow up speaking English, and his English language skills are extremely limited. Martinez-Guerrero Decl. ¶ 1; *see also* Jones Decl. ¶ 3.

4.     Mr. Martinez-Guerrero is a member of the Garífuna community, a formerly enslaved Afro-indigenous group that consistently suffers from severe and often violent

1

persecution and discrimination in Honduras. Dkt. 148-1 at 21; *see* Press Release, Congressman Jesus G. García, Representatives García, Bush, Omar, Schakowsky & Bowman Introduce Resolution to Affirm Rights of Honduras' Garífuna People (Dec. 14, 2022), https://perma.cc/5HEL-FX4W (recognizing that "Garífuna community members and leaders have been threatened, arrested, abducted and murdered . . . [and their] rights have repeatedly been violated by the Honduran government"); David Gonzalez, Garífuna Immigrants in New York, N.Y. Times (Jul. 24, 2015), https://perma.cc/5XNJ-S9QV (noting that violence targeting the Garífuna community has led many to immigrate to the United States).

5.      Mr. Martinez-Guerrero was first exposed to gang violence at just twelve years of age, when his father was murdered by the Barrio 18 gang. Dkt. 147 at 2; Dkt. 148-1 at 21. The Barrio 18 gang is a deadly and pervasive presence throughout Honduras and is one of the largest gangs in the hemisphere. *See* Press Statement, Marco Rubio, Secretary of State, Terrorist Designation of Barrio 18 (Sep. 23, 2025), https://perma.cc/3BRQ-E4JK (designating the Barrio 18 gang a foreign terrorist organization); *see also* Vanessa Buschschlüter, Honduras Gang Violence at 'War-Like Levels' – NGO, BBC (Apr. 24, 2023), https://perma.cc/9742-TU46 (head of Norwegian Refugee Council comparing murders in Honduras to "armed conflicts"); Fritz Pinnow & Valeria Solis, Beyond Drugs – Gangs' Control Over Urban Areas in Honduras, Conta Corriente (July 25, 2024), https://perma.cc/9C3L-PYZU (describing Barrio 18 as one of "the largest and most notorious gangs" of the Northern Triangle).

6.      By the time his father's remains were recovered, they were so mutilated that Mr. Martinez could only recognize the body by the clothes his father wore. Dkt. 148-1 at 21.

7.      Shortly thereafter, Mr. Martinez-Guerrero's mother abandoned the family home, claiming the house was cursed, and left Mr. Martinez-Guerrero to live alone for approximately

two years as a preteen. *Id.* Mr. Martinez-Guerrero dropped out of school to work to support himself, but still he often went hungry. *Id.*; *see also* Martinez-Guerrero Decl. ¶ 6.

8.      As a teenager, Mr. Martinez-Guerrero again faced extreme violence when he lost two cousins in gang attacks. The first of the two murders happened in front of him: a gang member attempted to shoot Mr. Martinez-Guerrero, who had previously been beaten for refusing to join the gang. Martinez-Guerrero Decl. ¶¶ 7–8. The bullet missed Mr. Martinez-Guerrero, instead striking and killing his cousin. *Id.* ¶ 8.

9.      Mr. Martinez-Guerrero's mother returned to the family home after approximately two years, and together, they fled the violence. Martinez-Guerrero Decl. ¶ 9. When he was approximately fourteen years old, Mr. Martinez-Guerrero and his mother left Honduras. *Id.*

10.     At the age of seventeen, Mr. Martinez-Guerrero entered the United States by himself. *Id.* ¶ 10. He settled in the Bronx, New York, where he had extended family, and worked in automobile repair shops and in construction. *Id.* ¶ 10–11; Dkt. 147 at 3.

11.     Mr. Martinez-Guerrero's life in the United States, while safer than it was in Honduras, still involved traumatic episodes. He became romantically involved with a woman five years his senior who abused and threatened him, even hitting him in the eye with an umbrella and sending him to the hospital. Martinez-Guerrero Decl. ¶ 12; Dkt. 148-1 at 22. Following that abusive relationship, Mr. Martinez-Guerrero met his current partner, Shamisha Jones. Today, they have two children together, both of whom are U.S. citizens. Martinez-Guerrero Decl. ¶ 12; Jones Decl. ¶ 18.

12.     Mr. Martinez-Guerrero holds Special Immigrant Juvenile ("SIJ") status, an immigration classification available to certain immigrant youth who have been abused, neglected, or abandoned by one or both parents. Dkt. 148-1 at 21; Searle Decl. ¶ 25. His

3

application to adjust his status and become a lawful permanent resident, based on his SIJ status, is currently pending before United States Citizenship and Immigration Services ("USCIS"). *Id*.

13.   Additionally, Mr. Martinez-Guerrero's applications for asylum, withholding of removal, and relief under the Convention Against Torture have been pending before USCIS since 2018. Dkt. 148-1 at 21.

14.   In late 2019, Mr. Martinez-Guerrero was detained on state criminal charges that were ultimately dismissed. *Id* at 22. Despite the criminal charges being dropped and his pending asylum application, Mr. Martinez-Guerrero spent seven months in Immigration Customs Enforcement ("ICE") custody at the onset of the COVID pandemic. Martinez-Guerrero Decl. ¶ 13. He was forced to remain in his cell for 23 hours each day, causing his mental health to deteriorate: as a result of the isolation, Mr. Martinez-Guerrero suffered from auditory hallucinations and suicidal ideation prior to his release in May 2020. *Id.*

### A.   Petitioner's Indictment and Arrest

15.   On March 18, 2024, Mr. Martinez-Guerrero was indicted in the Southern District of New York on a single count of conspiracy to commit theft from interstate shipments, in violation of 18 U.S.C. § 371. Dkt. 2 at 4. He was not named in any of the six substantive counts in the indictment, which charged seven other defendants. *Id*.

16.   The sole overt act attributed to Mr. Martinez-Guerrero in the indictment was the driving of a U-Haul box truck from the Bronx, New York, to West Haven, Connecticut, on just one occasion. Dkt. 2 at 5.

17.   On April 3, 2024, Mr. Martinez-Guerrero was presented before Magistrate Judge Robyn F. Tarnofsky and released on bond. *See* Dkt. 28; Dkt. 29.

18.    Throughout the criminal proceedings, Mr. Martinez-Guerrero was represented by David Touger ("Mr. Touger" or "trial counsel") of Peluso & Touger LLP, appointed under the Criminal Justice Act.  *Id*.

### B.    Petitioner's Pre-Plea and Sentencing Representation

19.    Beginning in April 2024, Mr. Touger began corresponding with Ms. Nora Searle ("Ms. Searle"), Mr. Martinez-Guerrero's attorney overseeing his active immigration-related applications.  *See* Searle Decl. ¶ 6.  Throughout Mr. Touger's representation of Mr. Martinez-Guerrero, Mr. Touger and Ms. Searle corresponded about how Mr. Martinez-Guerrero's criminal proceedings might affect his immigration status.  *See id.* ¶¶ 6–25.

20.    In October 2024, Ms. Searle repeatedly urged Mr. Touger to consult with a federal *Padilla* immigration specialist[1] regarding the consequences of a proposed plea, making clear she was not an expert on the potential implications of a plea for Mr. Martinez-Guerrero's immigration applications and status.  *See* Searle Decl. ¶¶ 8–9.  For instance, on October 9, 2024, Ms. Searle asked Mr. Touger who he consulted for *Padilla* purposes, but Mr. Touger did not provide a response.  *Id*. ¶ 12.  On October 17, 2024, Ms. Searle followed up: "I generally consult on New York state-level criminal charges.  I'm happy to talk this over with your regular Padilla consultant, though—would you be able to put us in touch?"  *Id*. ¶ 15.  Again, Mr. Touger did not engage with the request.  *Id*.

21.    On November 4, 2024, Ms. Searle made a third attempt to encourage Mr. Touger to consult an immigration expert.  *Id*. ¶ 17.  Mr. Touger responded only that the prosecution would

---

[1] In *Padilla v. Kentucky*, the Supreme Court announced that "counsel must advise her client regarding the risk of deportation," and the failure to do so serves as the basis for an ineffective assistance of counsel claim. 559 U.S. 356, 367 (2010).  Accordingly, '*Padilla* immigration specialists' are attorneys who specialize in counseling criminal defendants on the immigration consequences of their sentences.  *See, e.g.*, *Padilla Support Center*, Immigr. Def. Project, https://perma.cc/3ZRF-A2XN (last visited Apr. 22, 2026); *Regional Immigration Assistance Centers (RIACs)*, N. Y. St. Office Indigent Legal Servs., https://perma.cc/N3YC-22L5 (last visited Apr. 22, 2026).

not budge, and once more failed to engage with Ms. Searle's inquiry about a *Padilla* consultant. *Id*.

22.    On November 20, 2024—five days after the plea agreement was executed, without Ms. Searle's knowledge—Ms. Searle asked Mr. Touger directly whether his "immigration counsel advised [Deylin] that this plea will make him deportable, cause his green card application to be denied, and likely subject him to mandatory [ICE] detention." *Id.* ¶ 22.  Mr. Touger still did not answer Ms. Searle's direct question about what Mr. Martinez-Guerrero had been advised.  *Id*.

23.    During the plea negotiations, Mr. Martinez-Guerrero met with Mr. Touger and the Assistant U.S. Attorneys.  Martinez-Guerrero Decl. ¶ 18.  Mr. Touger instructed him to tell the prosecutors everything he knew, and Mr. Martinez-Guerrero requested and received a translator. *Id*.

24.    Despite Mr. Touger's awareness that Mr. Martinez-Guerrero had very limited English comprehension, Mr. Martinez-Guerrero was not provided with a translator in court at his presentment, at his plea, or even at his sentencing.  *See* Martinez-Guerrero Decl. ¶¶ 16, 23, 29; Lilienfeld Decl., Ex. 1 (Presentment Tr.); Lilienfeld Decl., Ex. 3 (Plea Tr.); Lilienfeld Decl., Ex. 5 (Sentencing Tr.).

25.    Mr. Martinez-Guerrero's girlfriend, Shamisha Jones ("Ms. Jones"), lived with him throughout Mr. Touger's representation.  Jones Decl. ¶¶ 2–3.  On one occasion when Mr. Martinez-Guerrero was in custody, Ms. Jones expressly requested that Mr. Touger provide a Spanish-language interpreter to Mr. Martinez-Guerrero because she did not believe he could understand court proceedings or legal advice without one.  *Id*. ¶ 4.  Mr. Touger refused, stating to

Ms. Jones that an interpreter was unnecessary because Mr. Martinez-Guerrero "handled himself well in court." *Id*.

26. Mr. Martinez-Guerrero repeatedly asked Mr. Touger about any potential immigration consequences of accepting a plea deal. Martinez-Guerrero Decl. ¶¶ 21–22. Given his established life in the United States, his role as a father to three young children, and his justified fear of gang persecution if he returned to Honduras, Mr. Martinez-Guerrero wanted to prioritize staying in United States over any other consequence, including any amount of jail time or probation. *Id.* ¶ 32.

27. On multiple occasions, Mr. Martinez-Guerrero specifically asked Mr. Touger about whether the plea proposed by the Government could affect his immigration status. *Id.* ¶¶ 21–22. The first time, Mr. Touger side-stepped the question and said he was reviewing the matter with Mr. Martinez-Guerrero's immigration attorney. *Id.* ¶ 21. The next time Mr. Martinez-Guerrero raised the question, Mr. Touger told him "not to worry about that." *Id.* ¶ 22. Mr. Martinez-Guerrero understandably took this as legal advice from Mr. Touger that he would, at minimum, have a reasonable likelihood of remaining in the United States if he accepted the plea deal. *Id.*

28. Despite her many conversations with Mr. Touger, Ms. Jones also never observed him mention Mr. Martinez-Guerrero's risk of removal or deportation—including mandatory deportation—or suggest that immigration-specific advice be obtained before the plea was entered. Jones Decl. ¶¶ 10, 12, 15.

### C.    Petitioner's Plea Agreement and Plea Hearing

29. On November 15, 2024, the Government and Mr. Martinez-Guerrero, through counsel, executed a seven-page plea agreement in the form of a letter from the U.S. Attorney's Office to Mr. Touger. *See* Lilienfeld Decl., Ex. 2 (Plea Agreement) at 1–7. The plea agreement was written entirely in English. *Id.* Mr. Martinez-Guerrero was never given a Spanish-language

translation of the agreement, and he was never able to use an interpreter to translate the plea agreement for him. Martinez-Guerrero Decl. ¶ 25. Ms. Jones also never observed Mr. Touger review the agreement with Mr. Martinez-Guerrero, explain its terms or consequences, or ensure that Mr. Martinez-Guerrero understood what he was agreeing to before signing. Jones Decl. ¶¶ 9–10.

30. The agreement required Mr. Martinez-Guerrero to waive his right to appeal or collaterally challenge his conviction and to accept a stipulated Guidelines range of 21 to 27 months' imprisonment. *See* Lilienfeld Decl., Ex. 2 (Plea Agreement) at 4-6. Though the plea agreement stated that Mr. Martinez-Guerrero's guilty plea made his "removal from the United States . . . presumptively mandatory," *id.* at 6, Mr. Touger did not explain or translate this clause to Mr. Martinez-Guerrero. Martinez-Guerrero Decl. ¶ 26.

31. On December 20, 2024, Mr. Martinez-Guerrero appeared before the Honorable Edgardo Ramos for a change of plea hearing. *See* Lilienfeld Decl., Ex. 3 (Plea Tr.) at 1. Though Mr. Martinez-Guerrero had told Mr. Touger he would need a translator for his court appearance, no interpreter was present. *See id.; see also* Martinez-Guerrero Decl. ¶ 23. At the outset of the plea colloquy, the Court asked Mr. Martinez-Guerrero a series of background questions. When asked whether he was "able to read and write in English," Mr. Martinez-Guerrero responded: "A little bit." Lilienfeld Decl., Ex. 3 (Plea Tr.) at 4. The Court did not follow up on this or inquire further into Mr. Martinez-Guerrero's comprehension of English, and no interpreter was provided for the remainder of the proceeding. *See id.*

32. The Court asked Mr. Martinez-Guerrero whether he had received, read, and discussed the indictment with his attorney. *See id*. at 8. After conferring with counsel, Mr. Martinez-Guerrero answered, "Yes." *Id*. The Court then asked whether Mr. Martinez-Guerrero

8

was a United States citizen, and he stated that he was a citizen of Honduras.  *See id*. at 14.  The Court further asked whether he understood that "there could be adverse immigration consequences, including possible deportation, as a result of your plea," and that "there is a likelihood that you will be deported from the United States after you serve out your sentence." *Id.* at 14–15.

33.    Despite not fully understanding what the Court was asking him, Mr. Martinez-Guerrero answered each question after looking at Mr. Touger, who indicated either "yes" or "no" as to each question.  *See* Martinez-Guerrero Decl. ¶ 24.  Mr. Martinez-Guerrero answered either "Yes, your Honor" or "No, your Honor" according to Mr. Touger's instructions. *Id.*

34.    The Court then turned to the plea agreement: when asked whether he had read the seven-page letter or had it read to him before he signed it, Mr. Martinez-Guerrero answered "Yes."  Lilienfeld Decl., Ex. 3 (Plea Tr.) at 19.  This was untrue, but Mr. Martinez-Guerrero had been instructed by Mr. Touger to say "yes."  No translated copy of the plea agreement was ever provided to Mr. Martinez-Guerrero, nor had the document even been read to him.  *See* Martinez-Guerrero Decl. ¶ 25.

35.    When the Court asked Mr. Martinez-Guerrero to describe "in [his] own words what it was that [he] did that [made him] guilty," he began reading from a prepared written statement rather than speaking extemporaneously, prompting the Court to ask, "Are you reading?" Lilienfeld Decl., Ex. 3 (Plea Tr.) at 22.  After conferring with counsel, the Court permitted Mr. Martinez-Guerrero to read from the statement.  *Id*.

36.    Based on Mr. Martinez-Guerrero's answers to the Court's questions—given without the assistance of an interpreter, without a translated plea agreement, and based upon Mr.

9

Touger's instructions, rather than any real comprehension of the colloquy —the Court accepted the guilty plea. *See id.* at 27.

37.    Mr. Martinez-Guerrero did not understand at the time of his plea that it could lead to his mandatory deportation.  Mr. Martinez-Guerrero would not have entered the guilty plea had he been advised of this.  *See* Martinez-Guerrero Decl. ¶¶ 27, 32.

    **D.**       **Petitioner's Sentencing**

38.    On April 9, 2025, the day prior to Mr. Martinez-Guerrero's scheduled sentencing, Mr. Touger asked Ms. Searle for legal authority that would demonstrate to the court that a sentence of under a year would allow Deylin to remain in the United States.  Searle Decl. ¶ 23. Ms. Searle complied with Mr. Touger's request out of concern that, if she did not provide the relevant legal authority, no immigration-related information about Deylin would be presented at the sentencing.  *Id.* ¶ 24.

39.    On April 10, 2025, Mr. Martinez-Guerrero appeared before Judge Ramos for sentencing.  *See* Lilienfeld Decl., Ex. 5 (Sentencing Tr.) at 1.

40.    Mr. Touger requested a sentence of 364 days' imprisonment, arguing that any sentence exceeding one year would give Mr. Martinez-Guerrero "no right[] to stay in this country[.]" *Id*. at 10-12.  Later in the hearing, however, trial counsel stated that "Mr. Martinez-Guerrero has not shown anything to this Court . . . to show that he deserves a break from the guidelines." *Id*. at 15.

41.    When the Court invited Mr. Martinez-Guerrero to speak, he stated: "Right now, I can't speak—I know what I do is wrong.  I don't even know how to say it." *Id*. at 18.  After conferring with his client, Mr. Touger acknowledged to the Court: "He's having a hard time expressing himself in English, your Honor." *Id*.  Mr. Touger then continued: "He understands English completely, but is there an ability to get an interpreter so he could speak in Spanish to

you?" *Id*. Based on his interactions with Mr. Martinez-Guerrero, it would have been obvious to Mr. Touger that Mr. Martinez-Guerrero does not "understand[] English completely." *See* Martinez-Guerrero Decl. ¶ 1. When the Court responded that it could not obtain an interpreter at that time, Mr. Touger immediately indicated, without consulting with Mr. Martinez-Guerrero, that it was fine to proceed without an interpreter. *See* Lilienfeld Decl., Ex. 5 (Sentencing Tr.) at 19. Mr. Martinez-Guerrero's subsequent attempt at an allocution in English was incomplete and marked by broken syntax:

> I know whatever I do is wrong, but thank God, I never -- I know whatever I do is wrong, I feel sorry for that, but at the time I'm doing that, I never know it so bad. Now I understand, if you do wrong, you get wrong stuff back, you know. Now I feel sorry for whatever I did, you know? I don't mean it, to do it, and now, but in that time, I did it. Now I see the consequences of the act I do.
>
> I pray to God to say whatever God has to do.

*Id*. at 19–20.

42.    The Court sentenced Mr. Martinez-Guerrero to 21 months' imprisonment, to be followed by three years of supervised release, consistent with the sentencing range stipulated to in the plea agreement. *See id*. at 21, 24; *see also* Lilienfeld Decl., Ex. 2 (Plea Agreement) at 4.

43.    The judgment was entered on April 17, 2025. *See* Dkt. 157.

44.    Mr. Martinez-Guerrero began serving his sentence on October 29, 2024 and is scheduled to finish serving his sentence on July 29, 2026.

45.    Petitioner did not file a direct appeal. *See United States v. Sapia*, Nos. 02-cv-649 & 199-cr-1193, 2002 WL 620483, at *4 (S.D.N.Y. Apr. 18, 2002) ("because [petitioner's] claims are based on ineffective assistance of counsel . . . he may raise these arguments for the first time in his 2255 motion, notwithstanding the fact that he did not raise the issues on appeal").

**GROUNDS FOR RELIEF**

46.    The individual and cumulative effect of counsel's deficient performance denied Mr. Martinez-Guerrero his right to effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

47.    To establish that counsel's performance is unconstitutionally ineffective, a defendant must show (1) "that counsel's performance was deficient," meaning that the performance "fell below an objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense," meaning that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "The first prong—constitutional deficiency—is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 688). Under the second prong, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

48.    Although this burden can be significant, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." *Strickland*, 466 U.S. at 693.

**I.    MR. MARTINEZ-GUERRERO'S COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE.**

49.    Throughout his representation of Mr. Martinez-Guerrero, who had limited English language skills, Mr. Touger rendered counsel that fell far short of the standard set forth in *Strickland*. In particular, Mr. Touger (1) failed to alert Mr. Martinez-Guerrero about the risk of

12

mandatory deportation in accepting the plea, (2) failed to arrange for a translator so that Mr. Martinez-Guerrero could understand his own legal proceedings, and (3) neglected to obtain and share a translated copy of a plea agreement, or explain the agreement in a way that Mr. Martinez-Guerrero could reasonably comprehend.

### A.    Trial Counsel Rendered Constitutionally Ineffective Assistance by Misadvising Mr. Martinez-Guerrero Regarding the Immigration Consequences of His Guilty Plea.

50.    Trial counsel's repeated erroneous statements to Mr. Martinez-Guerrero about immigration consequences fell far below the standard of effective representation required under *Strickland*, particularly because Mr. Martinez-Guerrero was obviously more concerned with possible deportation than any potential jail time.

51.    *Padilla* established that Mr. Touger had, at minimum, an obligation to "advise [his] noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences."  559 U.S. at 369; *see also Libretti v. United States*, 516 U.S. 29, 50 (1995) (counsel has an obligation to advise the client of "the advantages and disadvantages of a plea agreement); *Farhane v. United States*, 121 F.4th 353, 364 (2d Cir. 2024)  ("it is clear that the Sixth Amendment requires criminal defense counsel to advise his client of the risk of denaturalization and the associated heighted risk of deportation that flow from his guilty plea").

52.    Because the plea agreement involved a crime of moral turpitude with a stipulated sentencing range exceeding one year *and* expressly rendered deportation "presumptively mandatory," counsel's suggestion that Mr. Martinez-Guerrero could nonetheless avoid removal constitutes precisely the kind of "incorrect advice" *Padilla* forbids.  *Padilla*, 559 U.S. at 360, 369.  Even if Mr. Touger had acknowledged to Mr. Martinez-Guerrero that *some* immigration consequences could result from his plea, this would not constitute the "accurate advice" to which Mr. Martinez-Guerrero was entitled.  *Mohamed v. United States*, No. 18-cv-11193, 2020 WL

1503073, at *2 (S.D.N.Y. Mar. 30, 2020).  Though Mr. Touger knew that Mr. Martinez-Guerrero was a noncitizen and that his plea would subject him not only to general immigration consequences, but to *mandatory* deportation, he did not advise Mr. Martinez-Guerrero of that fact.

53.    Moreover, the existence of "presumptively mandatory" language in a plea agreement, even where the defendant *does* speak the language the agreement is written in, does not cure inaccurate advice of counsel— Mr. Martinez-Guerrero, "acting on the advice of counsel, may have reasonably understood this paragraph not to apply to his unique circumstances," since his attorney had assured him not to worry.  *United States v. Ferrera*, No. 10-CR-892, 2020 WL 7342673, at *6 (S.D.N.Y. Dec. 14, 2020).  Mr. Touger's insistence that Mr. Martinez-Guerrero need not worry about immigration consequences is exactly the ineffective advice that would have ameliorated Mr. Martinez-Guerrero's concerns, *even if* he had been able to read and understand the plea agreement.  *See id.* ("Moreover, [counsel's] continued advice that [the defendant's] immigration issues would 'not be a problem' presumably ameliorated any of [defendant's] concerns about this ["presumptively mandatory"] paragraph.").

54.    Mr. Touger was aware of the importance to Mr. Martinez-Guerrero of any immigration consequences: he routinely received correspondence from Ms. Searle beginning as early as April 2024 about the dire nature of those consequences.  *See* Searle Decl. ¶ 6.  Ms. Searle repeatedly referenced Mr. Martinez-Guerrero's immigration case in messages she sent throughout October 2024, before the plea agreement was signed, and expressly referenced Mr. Touger's *Padilla* obligations numerous times.  *See id.* ¶¶ 6–20.

55.     Had Mr. Touger been "constitutionally competent counsel[, he] would have advised [Mr. Martinez-Guerrero] that his conviction . . . made him subject to automatic deportation." *Padilla*, 559 U.S. at 360.

56.     However, much like the attorney in *Padilla*, Mr. Touger "provided [Mr. Martinez-Guerrero] false assurance that his [guilty plea] would not result in his removal from this country." *Id.* at 368.  Mr. Touger outright dismissed Mr. Martinez-Guerrero's concern about possible deportation, telling him "not to worry about that."  Martinez-Guerrero Decl. ¶ 22.  As in *Padilla*, "[t]his is not a hard case in which to find deficiency," given Mr. Touger's "advice was incorrect." *Padilla*, 559 U.S. at 368–69.

57.     The email correspondence between Mr. Touger and Ms. Searle corroborates Mr. Martinez-Guerrero's account of his representation.  On November 20, Ms. Searle asked Mr. Touger if his "immigration counsel" had advised Mr. Martinez-Guerrero that the plea would "make him deportable[.]"  Searle Decl. ¶ 22.  Mr. Touger responded by evading her question, stating "he" thought if the sentence were under a year, Mr. Martinez-Guerrero had a possibility of staying. *Id*.  Though Ms. Searle understood the "he" referenced by Mr. Touger to be Deylin himself, even if Mr. Touger *did* speak with specialized immigration counsel, he provided no indication to Ms. Searle that he ever warned Mr. Martinez-Guerrero about the risk of mandatory deportation.  Mr. Touger's communications with Ms. Searle are entirely consistent with Mr. Martinez-Guerrero's recollection that Mr. Touger in fact told him "not to worry" about immigration consequences.  Martinez-Guerrero Decl. ¶ 22.

58.     Falsely reassuring a client that a guilty plea would not trigger deportation falls so short of effective representation that this circuit recognized it as constitutionally deficient even before *Padilla*.  *See United States v. Couto*, 311 F.3d 179, 188 (2d Cir. 2002) ("an affirmative

15

misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable [and] such a misrepresentation meets the first prong of the *Strickland* test") (abrogated on other grounds by *Padilla*, 559 U.S. 356). Before the Supreme Court recognized that attorneys have an *affirmative* obligation to warn clients about the risk of deportation, this circuit recognized that, at minimum, attorneys have an obligation to avoid making *affirmative misrepresentations* to clients regarding such risk. *See, e.g.*, *Thomas v. United States*, Nos. 19-CV-5675 & 01-CR-579, 2020 WL 3428148, at *3 (S.D.N.Y. June 23, 2020) (counsel had "a duty not to make affirmative misrepresentations [] regarding the immigration consequences of a guilty plea.").

59.    This case falls squarely into the category of an affirmative misrepresentation. In *Rodriguez v. United States*, the Second Circuit found that trial counsel had provided objectively ineffective assistance where he provided assurances nearly identical to those given by Mr. Touger. In that case, the defendant pleaded guilty, relying on her counsel's false assurances that she "did not have to worry about the immigration consequences." 730 F. App'x 39, 42 (2d Cir. 2018). There, as here, trial counsel provided these assurances prior to the guilty plea and the defendant relied on that advice when entering the plea. *Id*. at 41; *see also* Martinez-Guerrero Decl. ¶ 22. The Second Circuit upheld that counsel's "alleged advice that [her client] need not worry about immigration consequences . . . [fell] below an objective standard of reasonableness." *Rodriguez*, 730 F. App'x at 42; *see also Doe v. United States*, 915 F.3d 905 (2d Cir. 2019) (first *Strickland* prong met where trial counsel told client that he "should not have a problem with the immigration authorities and should not face deportation" after entering a guilty plea).

16

60.     Courts in this District have recognized this same set of fact as ineffective assistance of counsel.  For example, in *Ferrera*, the petitioner was in the same situation as Mr. Martinez-Guerrero: he pled guilty to a crime without ever being advised by counsel that his plea would result in a mandatory deportation.  No. 10-CR-892, 2020 WL 7342673, at *2–3 (S.D.N.Y. Dec. 14, 2020).  The court concluded that such representation, wherein a counsel's "failure to clearly inform [a client] that his guilty plea would subject him to mandatory deportation[,] constitutes objectively unreasonable representation."  *Id.* at *3.

61.     At bottom, the Supreme Court and the Second Circuit have long required criminal defense attorneys to accurately warn clients about the risk of deportation associated with a guilty plea.  Failure to warn a client about the possibility of mandatory deportation is particularly important where "[p]reserving the client's right to remain in the United States may be more important to the client than any potential jail sentence."  *Immigr. & Naturalization Serv. v. St. Cyr*, 533 U.S. 289, 322 (2001) (quoting 3 Bender, Criminal Defense Techniques §§ 60A.01, 60A.02[2] (1999)).  Indeed, Mr. Martinez-Guerrero repeatedly asked Mr. Touger about the immigration consequences of accepting a plea deal precisely because of his deep fear of returning to Honduras.  *See* Martinez-Guerrero Decl. ¶ 32.

62.     Still, Mr. Touger told Mr. Martinez-Guerrero not to worry about deportation and ignored Ms. Searle's request for confirmation that he relay those risks to Mr. Martinez-Guerrero, indicating that his representation fell short of the objective standard of reasonableness set out in *Padilla*.

63.     Nor did the Court's instruction sufficiently remedy Mr. Touger's inaccurate advice.  Specific warnings by a court about deportation can, at times, be sufficient to put a defendant on notice of immigration consequences.  *See Whyte v. United States*, Nos. 08–cr-1330

17

& 14–cv–3598, 2015 WL 4660904, at *9 (S.D.N.Y. Aug. 6, 2015) (citing *United States v. Bhindar*, No. 07-cr-711–04, 2010 WL 2633858, at *5 (S.D.N.Y. June 30, 2010)).  However, in this instance, Mr. Martinez-Guerrero could not fully understand the Court's warning given his limited English and the complexity of the issue.  The Court's instruction did not specifically advise that Deylin would be subject to mandatory deportation, rather, it explicitly contemplated both deportation and non-deportation scenarios.  The Court asked Mr. Martinez-Guerrero whether he understood that there "could be" adverse immigration consequences, including "possible" deportation.  Lilienfeld Decl., Ex. 3 (Plea Tr.) at 14.  The Court referenced "a likelihood" that Mr. Martinez-Guerrero could be deported, but then laid out scenarios in which Mr. Martinez-Guerrero was "not deported after serving [his] sentence" or was deported following his sentence.  *Id*. at 14–15.  Without the assistance of a translator, which his counsel failed to request, Mr. Martinez-Guerrero could not have understood even the basic implications of this instruction, much less that he would face mandatory deportation.

**B.    Trial Counsel Rendered Constitutionally Ineffective Assistance by Failing to Secure an Interpreter at All Critical Stages of the Plea and Sentencing Proceedings.**

64.    Trial counsel's failure to secure an interpreter for Mr. Martinez-Guerrero, a native Spanish speaker with limited English language skills, was also deficient under *Strickland*.  Mr. Touger failed to arrange for an interpreter during attorney-petitioner meetings and critical court proceedings—the sole exception being a single proffer session—despite clear and repeated indications that Mr. Martinez-Guerrero could not meaningfully communicate in English.

65.    Mr. Martinez-Guerrero's criminal proceedings, which included attorney-petitioner consultations, the plea hearing, and the sentencing hearing, were conducted entirely in English despite his limited English language skills, denying him the ability to meaningfully participate in his own defense.  The Sixth Amendment and the Due Process Clause of the Fourteenth

18

Amendment prohibit criminal proceedings in which a defendant is "hampered by [his] inability to communicate in the English language." *United States v. Mosquera*, 816 F. Supp. 168, 173 (E.D.N.Y. 1993). Accordingly, an interpreter is required whenever language barriers inhibit a defendant's comprehension of the proceedings or his ability to communicate meaningfully. *United States ex rel. Negron v. State of N. Y.*, 434 F.2d 386, 389 (2d Cir. 1970). This right extends to attorney-client communications. The Sixth Amendment's guarantee of effective assistance of counsel is meaningless "unless the petitioner can provide his or her lawyer with intelligent and informed input." *United States v. Mosquera*, 816 F. Supp. 168, 173 (E.D.N.Y. 1993).

66.    Importantly, the constitutional threshold is not total incomprehension. Even a defendant with "a working knowledge of English" may require an interpreter when the proceedings involve technical legal concepts. *See United States v. Henry*, 888 F.3d 589, 602–03, 605 (2d Cir. 2018) (affirming district court's decision to require interpreter throughout trial where defendant spoke "good English" but "not great English" and "had trouble with more technical language"). The question is whether a defendant's language limitation "hamper[s]" his ability to understand the proceedings and communicate with counsel. *Negron*, 434 F.2d at 390; *see also* 28 U.S.C. § 1827(d)(1) (requiring appointment of an interpreter whenever a party "speaks only or primarily a language other than the English language" such that it "inhibit[s] such party's comprehension of the proceedings or communication with counsel").

67.    These protections apply with full force at plea and sentencing—both "critical stages" at which a defendant must be able to participate meaningfully. *See Boykin v. Alabama*, 395 U.S. 238, 243–44 (1969); *Mempa v. Rhay*, 389 U.S. 128, 134 (1967). A valid guilty plea requires "a voluntary and intelligent choice among the alternative courses of action open to the

19

defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970).  Such a choice, in turn, demands "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "a rational as well as factual understanding of the proceedings."  *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam); s*ee also Hill v. Lockhart*, 474 U.S. 52, 56 (1985).  Mr. Martinez-Guerrero's language barrier precluded both.  Without an interpreter, he could not understand the rights he was waiving, the terms of the plea agreement, or the consequences of his guilty plea.

68.     Courts have found deficient performance where the evidence of a defendant's language barrier was far less compelling than it is here.  In *Gonzalez v. Phillips*, 195 F. Supp. 2d 893 (E.D. Mich. 2001), the court found that defense counsel's failure to request an interpreter fell outside the range of reasonably professional assistance where the defendant's first language was Spanish, he had limited education and limited English language abilities, and counsel had previously used a bilingual interpreter to communicate with him.  *Id.* at 897, 900–02.  Similarly, in *Negron*, the Second Circuit held that where a defendant's "language disability was obvious, not just a possibility," and the trial court was "on notice of . . . defendant's severe language difficulty," the court was required, at a minimum, to "make unmistakably clear to [the defendant] that he ha[d] a right to have a competent interpreter assist him, at state expense if need be, throughout his trial."  434 F.2d at 390–91.

69.     The record here is stronger still.  At the outset of the plea colloquy on December 20, 2024, when the Court asked whether Mr. Martinez-Guerrero was "able to read and write in English," he responded: "A little bit."  Lilienfeld Decl., Ex. 3 (Plea Tr.) at 4.  The Court did not follow up on this admission or inquire further into Mr. Martinez-Guerrero's comprehension, and no interpreter was provided.  Later in the same proceeding, when the Court asked Mr.

20

Martinez-Guerrero to describe in his own words what he did to make him guilty, he began reading from a prepared written statement, prompting the Court to ask, "Are you reading?" *Id*. at 22. As Mr. Martinez-Guerrero struggled to even read from the paper, Mr. Touger stood next to him looking at the paper, prompting Mr. Martinez-Guerrero on what to say next. *See* Martinez-Guerrero Decl. ¶ 28.

70.     Even without these in-court, on-the-record discussions of Mr. Martinez-Guerrero's limited English, the acknowledged need for, and use of, an interpreter at one of the proffer sessions with the Government corroborates the fact that Mr. Martinez-Guerrero was unable to fully and meaningfully participate without an interpreter. Yet, despite these clear indicators, no interpreter was requested at the plea hearing.

71.     Further evidence of Mr. Martinez-Guerrero's language limitations emerged at his sentencing on April 10, 2025. When the Court invited Mr. Martinez-Guerrero to address the Court, he indicated that he did not know enough English to properly express himself. *See* Lilienfeld Decl., Ex. 5 (Sentencing Tr.) at 18. When trial counsel asked for an interpreter and the Court stated that it could not obtain one, Mr. Touger immediately backtracked and said Mr. Martinez-Guerrero could communicate in English. *See id*. at 19. Mr. Martinez-Guerrero then attempted to address the Court, but the fragmented and irregular nature of his statement, as reflected in the transcript, confirms his inability to meaningfully communicate in English. *See id*.

72.     Mr. Martinez-Guerrero's claim is preserved: a defendant need not raise the issue of inadequate interpretive assistance if the need for an interpreter was "manifestly obvious." *Sosa v. Mohawk Corr. Facility*, No. 07-cv5916, 2008 WL 534764, at *6–7 (S.D.N.Y. Feb. 25, 2008). Nor can a defendant's silence be treated as waiver: an indigent defendant with minimal

educational background "thrown into a criminal trial as his initiation to our trial system" cannot be expected to comprehend "that he is in peril of forfeiting even the rudiments of a fair proceeding unless he insists upon them." *Negron*, 434 F.2d at 390. Here, Mr. Martinez-Guerrero's English-language limitations were manifestly obvious, given he admitted on the record that he could read and write in English only "a little bit," Lilienfeld Decl., Ex. 3 (Plea Tr.) at 4, and an interpreter had been used for a prior meeting with both Mr. Touger and the Government, Martinez-Guerrero Decl. ¶ 18.

73.    Even setting aside the "manifestly obvious" exception, Mr. Martinez-Guerrero personally raised the issue. He told the Court, "Right now, I can't speak—I know what I do is wrong. I don't even know how to say it." Lilienfeld Decl., Ex. 5 (Sentencing Tr.) at 18. Counsel relayed Mr. Martinez-Guerrero's request for an interpreter, acknowledging again on the record that he was struggling to "express[] himself in English." *Id*.

74.    Yet when the Court was unable to immediately provide an interpreter given counsel's failure to request it in advance, rather than request a brief continuance or adjournment, counsel chose to override his own client's expressed need for an interpreter and told the Court his client would "speak in English[.]" *Id*. at 19.

75.    In sum, counsel's pervasive failure to secure interpretive assistance—compounded by his affirmative misrepresentation that Mr. Martinez-Guerrero could proceed in English—fell below the objective standard of reasonableness required by the Sixth Amendment and prejudiced Mr. Martinez-Guerrero at every critical stage of the proceedings. *See Strickland*, 466 U.S. at 687–696; *Negron*, 434 F.2d at 389–91; *Gonzalez*, 195 F. Supp. 2d at 897–903.

22

C.   **Trial Counsel Rendered Constitutionally Ineffective Assistance by Failing to Secure Translated Copies of the Plea Agreement and Other Critical Court Documents**

76.   Finally, trial counsel also failed to provide effective representation when he provided his client with only English versions of the plea agreement and other critical court documents.  This failure independently satisfies both prongs of *Strickland*.

77.   Due process requires that "a defendant must be told what he has been accused of in a language he or she can understand." *United States v. Mosquera*, 816 F. Supp. 168, 175 (E.D.N.Y. 1993).  In *Mosquera*, Judge Weinstein held that the Sixth Amendment requires non-English-speaking defendants to receive written translations of critical documents—including the indictment, the plea agreement, any statutes referenced therein, and the presentence report—because defendants must be able to "review the document alone and with others to achieve a full understanding," including by consulting "with friends and family, or prepar[ing] questions for their attorneys." *Id.* at 175.  Without written translations, "[d]efense counsel loses a valuable resource if his or her client cannot understand the charge and supporting facts," and "[i]nadequate input from the [petitioner] who has failed to understand the evidence to be relied upon by the Government cannot be cured by the presence of an official court interpreter at a hearing or at trial." *Id.* at 175.

78.   In *United States v. Nissim*, No. 92-cr-425, 1994 WL 10624, at *1–2 (S.D.N.Y. Jan. 10, 1994), a defendant was permitted to withdraw his guilty plea based on his assertion that he understood very little English, his plea was entered without an interpreter, and he had never been provided with written or verbal translations of the indictment, complaint, or plea agreement. *See also United States v. Guide*, 891 F.3d 744, 748 (8th Cir. 2018) ("[L]anguage and cultural barriers can, in some circumstances, affect a defendant's ability to understand, and thus to knowingly and voluntarily waive, constitutional rights.").

79.     Here, the plea agreement was a seven-page letter from the U.S. Attorney's Office written entirely in English and containing complex legal concepts and terms. *See* Lilienfeld Decl., Ex. 2 (Plea Agreement) at 1-7. At the plea hearing, the Court asked Mr. Martinez-Guerrero whether he had read the letter or had it read to him before he signed it, and he answered "Yes." Lilienfeld Decl., Ex. 3 (Plea Tr.) at 19. But Mr. Martinez-Guerrero had already told the Court that he could read and write in English only "a little bit." *Id*. at 4. No translated copy of the plea agreement was ever provided to him.

80.     Counsel's failure to secure translated copies of these documents was deficient under *Strickland*'s first prong. After *Mosquera* and *Nissim*, counsel practicing in this District were on clear notice that non-English-speaking defendants are entitled to written translations of plea agreements and other critical documents. *See Mosquera*, 816 F. Supp. at 177–78 (ordering that "[i]nterpretations of written plea agreements shall be supplied by the United States Attorney to any defendant"). Even oral interpretation can be constitutionally insufficient to substitute for written translations. *See id.* at 175. Providing a defendant with neither—as occurred here—is a clear constitutional violation. Indeed, in *Sanders v. United States*, 130 F. Supp. 2d 447, 449 (S.D.N.Y. 2001), the court found no due process violation only because the defendant had been provided certified interpreter services at every court appearance and had received oral Spanish translations of the indictment, plea agreement, and pre-sentence report. Mr. Martinez-Guerrero received none of these protections—no certified interpreter at his court appearances, no oral translations during meetings with counsel, and no written translations of any document.

81.     The obligation to ensure that a petitioner understands the documents governing his case is among the most basic duties of defense counsel. Counsel here did not discharge that

24

duty.  Instead, he permitted Mr. Martinez-Guerrero—a defendant who could read only a little English—to sign a seven-page plea agreement that was never translated into his native language.

## II.    TRIAL COUNSEL'S CONDUCT PREJUDICED MR. MARTINEZ-GUERRERO BY PRECLUDING A MORE FAVORABLE PLEA AGREEMENT OR TRIAL.

82.    Mr. Touger's representation was not only constitutionally ineffective, but prejudiced Mr. Martinez-Guerrero by (1) foreclosing his opportunity to go to trial and (2) choosing not to prioritize immigration consequences in plea negotiations.

83.    This failure seriously prejudiced Mr. Martinez-Guerrero.  Without a translated plea agreement, he could not meaningfully review the terms of the plea, consult with family or friends about its provisions, or prepare informed questions for his attorney.  *See Mosquera*, 816 F. Supp. at 175.  The plea agreement contained critical provisions implicating his sentence and appeal rights, including a stipulated Guidelines range of 21 to 27 months' imprisonment, *see* Lilienfeld Decl., Ex. 2 (Plea Agreement) at 4, a broad waiver of the right to appeal or collaterally challenge the conviction and any sentence within or below that range, *id.* at 5–6, a forfeiture money judgment of $2,400, *id.* at 2, a consent order of restitution in the amount of $177,949.55, *id.*, and an acknowledgment that the guilty plea made Mr. Martinez-Guerrero's "removal from the United States . . . presumptively mandatory," *id.* at 6.  Mr. Martinez-Guerrero's "Yes" answers to the Court's questions about whether he understood these provisions cannot substitute for actual comprehension of the written document, especially given his attorney had instructed him to answer "Yes" to the Court's questions.  Martinez-Guerrero Decl. ¶ 24.  As *Mosquera* makes clear, the suggestion that a non-English-speaking defendant can rely on momentary oral summaries to understand complex legal documents "is unacceptable."  816 F. Supp. at 175.  Had Mr. Martinez-Guerrero understood that he would be subject to mandatory deportation, he would

25

not have accepted the Government's plea offer and pleaded guilty. *See Strickland*, 466 U.S. at 694.

84.     First, Mr. Martinez-Guerrero can demonstrate prejudice by showing that "but for counsel's unprofessional errors, there was a reasonable probability that the petitioner could have negotiated a plea that did not impact immigration status." *Kovacs v. United States*, 744 F.3d 44, 52 (2d Cir. 2014). The Second Circuit has recognized that "the severity of immigration consequences may [be] enough to . . . allow[] petitioner to negotiate a more favorable plea agreement with the Government." *Whyte*, 2015 WL 4660904 at *8 (internal quotation marks and citation omitted). In *Whyte*, the court recognized that the defendant faced "severe immigration consequences" because he had a wife and children who were American citizens and the defendant faced deportation to Ireland. *Id.* at *1–2, *8. Mr. Martinez-Guerrero's plea involved even more dire consequences. Mr. Martinez-Guerrero similarly has a partner and children who are U.S. citizens and residents, but as counsel revealed to the Court only after the plea was entered, "if he's deported back to Honduras, he will die." Lilienfeld Decl., Ex. 5 (Sentencing Tr.) at 12.

85.     More specifically, Mr. Martinez-Guerrero faces more than just deportation. If deported to Honduras, he would be a target for violence on two fronts: first, as a member of an indigenous group routinely facing persecution, and second, as a target of the Barrio 18 gang, which already attempted to murder him before he escaped to the United States. *Id.*; Dkt. 148-1 at 21-22.

86.     At the sentencing hearing, the Court asked the Government for any insight into how a sentence of 364 days may have "important" implications for Mr. Martinez-Guerrero's immigration status. Lilienfeld Decl., Ex. 5 (Sentencing Tr.) at 10. In response, the prosecutor

confessed to being "confused" about the basis of Mr. Touger's concerns for his client's immigration status. *Id*. This suggests that Mr. Touger failed to even discuss with the Government during plea negotiations that Mr. Martinez-Guerrero could be subject to mandatory deportation. In fact, Mr. Touger did not even have legal support to lay out these potential consequences himself as of the day before sentencing. *See* Searle Decl. ¶ 23. Had Mr. Martinez-Guerrero known the risk of mandatory deportation, he could have insisted that Mr. Touger *focus* on avoiding immigration consequences in the plea negotiations, rather than omit that discussion altogether.

87.     Mr. Martinez-Gerrero can also demonstrate prejudice by showing that he would have rationally rejected the plea agreement but for Mr. Touger's errors. If Mr. Martinez-Guerrero had understood the plea agreement he signed, communicated effectively with the Court at his plea hearing with the aid of a translator, or otherwise known that his plea agreement guaranteed deportation, he would have reasonably opted to go to trial.

88.     Throughout the proceedings, Mr. Martinez-Guerrero "placed particular emphasis on [immigration consequences] in deciding whether or not to plead guilty," *Kovacs*, 744 F.3d at 52, as evidenced by his repeated requests of Mr. Touger about potential immigration consequences. Martinez-Guerrero Decl. ¶ 21–22.

89.     Mr. Martinez-Guerrero's relative chances at trial cannot affect the court's consideration of prejudice. His showing of prejudice does not turn on "whether, had he gone to trial, the result . . . would have been different than the result of the plea bargain," but instead "whether [he] was prejudiced by the denial of the entire judicial proceeding[,] to which he had a right." *United States v. Hernandez*, 283 F. Supp. 3d 144, 152 (S.D.N.Y. 2018) (citing *Lee v. United States*, 582 U.S. 357, 364 (2017) (internal quotations omitted). Given Mr. Martinez-

Guerrero's justified fear of returning to Honduras, he would have understandably rejected the plea deal had he known that it could result in mandatory deportation.  Martinez-Guerrero Decl. ¶ 32.

## **PRAYER FOR RELIEF**

Wherefore, Petitioner respectfully requests this Court:

90.    Grant Petitioner's motion to vacate his guilty plea and set aside his sentence due to ineffective assistance of counsel;

91.    Order Petitioner's immediate release from custody;

92.    Order that Petitioner shall not be transferred to custody of the Department of Homeland Security ("DHS"), ICE, or USCIS; and

93.    Grant any further relief this Court deems just and proper.

Dated: April 30, 2026

Respectfully submitted,

*/s/ Megan J. Mers*
Megan J. Mers
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, DC 20001
T: (202) 662-6000
MMers@cov.com

Eva H. Lilienfeld (*pro hac vice forthcoming*)
Zhuoqian Li (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
30 Hudson Yards, New York
New York, NY 10001-2170
T: (212) 841-1000
ELilienfeld@cov.com
JLI@cov.com

Alessandra Elliott (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
Salesforce Tower

415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T: (415) 591-6000
AElliottHernandez@cov.com

*Counsel for Petitioner*

29

**VERIFICATION**

I hereby certify that on April 30, 2026, I caused to be filed the foregoing Memorandum of Law, which was served and filed electronically and made available for viewing and downloading from the Court's Electronic Case Filing System by all parties.

/s/ Megan J. Mers

Megan J. Mers
COVINGTON & BURLING LLP
One CityCenter
850 10th Street NW
Washington, DC 20001
T: (202) 662-6000
MMers@cov.com

Eva H. Lilienfeld (*pro hac vice forthcoming*)
Zhuoqian Li (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
30 Hudson Yards, New York
New York, NY 10001-2170
T: (212) 841-1000
ELilienfeld@cov.com
JLI@cov.com

Alessandra Elliott (*pro hac vice forthcoming*)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T: (415) 591-6000
AElliottHernandez@cov.com

*Counsel for Petitioner*