UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

*– against –*

DEYLIN MARTINEZ-GUERRERO,

Defendant.

DEYLIN MARTINEZ-GUERRERO,

Petitioner,

*– against –*

UNITED STATES OF AMERICA,

Respondent.

**OPINION & ORDER**

24-cr-154-6 (ER)

26-cv-3609 (ER)

RAMOS, D.J.:

Deylin Martinez-Guerrero moved to vacate his guilty plea and set aside his sentence pursuant to 28 U.S.C. § 2255 on April 30, 2026. Doc. 280. In support of his motion, he alleged that his former counsel's representation was constitutionally deficient. *Id.* For the reasons set forth below, the motion is DENIED.

## I. BACKGROUND

The Court assumes familiarity with the facts and briefly summarizes the relevant procedural history. Martinez-Guerrero was indicted on one count of conspiracy to commit theft from interstate or foreign shipments and to break and enter carrier facilities with intent to commit larceny therein on March 18, 2024. Doc. 2. He pleaded guilty to that offense pursuant to an agreement with the government, which the Court accepted after conducting a hearing on December 20, 2024. Doc. 284-3. The Court then sentenced Martinez-Guerrero to twenty-one months' imprisonment, followed by three years of

supervised release on April 10, 2025. Doc. 284-5 at 25. It also ordered him to pay $177,949.55 in restitution. *Id.* at 28.

Martinez-Guerrero filed the instant motion on April 30, 2026, while he was serving his prison sentence. Doc. 305 at 1. After Martinez-Guerrero completed his prison sentence on July 29, 2026, he was detained by U.S. Immigration and Customs Enforcement ("ICE") and ordered to appear before an immigration judge for removal proceedings on September 8, 2026. *Id.* at 2. Immigration officials charged that Martinez-Guerrero was removable pursuant to 8 U.S.C. § 1182(a)(2)(A)(i)(I), which applies to "any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime." Doc. 304-1 at 1. This charge is premised on Martinez-Guerrero's conviction for the instant offense. *Id.* In light of these developments and at the request of the parties, the Court directed Martinez-Guerrero's former counsel, David Touger, and the government to respond to the motion on an expedited briefing schedule. Doc. 305 at 2. The motion is fully briefed. Docs. 308, 309, 314, 316.

## II. LEGAL STANDARD

### A. Section 2255 Petition

A defendant in federal custody may bring a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255.[1] However, relief under § 2255 is generally available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995).

[1] The parties do not dispute that Martinez-Guerrero has satisfied § 2255's "in custody" and procedural requirements, and thus that the Court is permitted to consider his petition on the merits. Doc. 309 at 28 n.10.

The movant bears the burden of proving by a preponderance of evidence that he is entitled to § 2255 relief. *Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000).

An evidentiary hearing must be granted with respect to a § 2255 petition "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). To avoid summary dismissal without the benefit of a hearing, a petitioner is required to establish only that his claim is plausible. *See Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009). However, if the record contradicts the petitioner's factual assertions, the court is not required to assume that the claims are credible. *Id.* at 214. After it has reviewed both the petitioner's submissions and the underlying record, the court determines whether the petitioner may be able to establish a prima facie case at a hearing and, if material facts are in dispute, a hearing should usually be held. *Id.* at 213. However, "when the judge who tried the underlying proceedings also presides over a § 2255 motion, a full-blown evidentiary hearing may not be necessary." *Raysor v. United States*, 647 F.3d 491, 494 (2d Cir. 2011).

**B. Ineffective Assistance of Counsel**

Here, Martinez-Guerrero claims that his Sixth Amendment rights were violated because he received ineffective assistance of counsel. In general, an ineffective assistance of counsel claim requires a criminal defendant to demonstrate (1) that his counsel's performance "fell below an objective standard of reasonableness," measured in accordance with "prevailing professional norms," and (2) that counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). When considering a claim for ineffective assistance of counsel, courts must endeavor to "eliminate the distorting effects of hindsight" and to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The prejudice prong of the *Strickland* test requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. To show that an attorney's advice about the immigration consequences of a guilty plea was prejudicial, a petitioner must demonstrate that, but for the advice, there was reasonable probability that he (1) "could have negotiated a plea that did not impact [his] immigration status, or (2) "would not have pleaded guilty and would have insisted on going to trial." *Farhane v. United States*, 121 F.4th 353, 376 (2d Cir. 2024) (first quoting *Kovacs v. United States*, 744 F.3d 44, 52 (2d Cir. 2014) and then quoting *Lee v. United States*, 582 U.S. 357, 364–65 (2017)).

## III. DISCUSSION

Martinez-Guerrero contends that Touger's representation was constitutionally deficient insofar as Touger failed to: (1) secure an interpreter for attorney-client meetings and court proceedings, (2) provide Spanish-language translations of the plea agreement and other court documents, and (3) properly advise him of the immigration consequences of his guilty plea. Doc. 285 at 17–30. The Court addresses each argument in turn.

### A. Reasonableness of Counsel's Performance

#### *1. Failure to Secure an Interpreter*

Martinez-Guerrero's first claim of ineffective assistance rests on Touger's alleged failure to secure an interpreter for attorney-client meetings and critical court proceedings. Doc. 285 at 23–27.

The Second Circuit has recognized that a criminal defendant has a constitutional right to the use of an interpreter when necessary "to permit him to participate effectively in his own defense." *United States ex. rel. Negron v. New York*, 434 F.2d 386, 390–91 (2d Cir. 1970); *see also Abdullah v. I.N.S.*, 184 F.3d 158, 164 (2d Cir. 1999). Because a "defendant has a right to 'consult with his lawyer with a reasonable degree of rational understanding,'" this right extends to a defendant's communications with his attorney. *Elize v. United States*, No. 02-CV-1350 (NGG), 2008 WL 4425286, at *7 (E.D.N.Y. Sept. 30, 2008) (quoting *Negron*, 434 F.2d at 389); *cf. Rodriguez v. United States*, 679 F. App'x 41, 44 (2d Cir. 2017) (suggesting that "a defendant might bring a plausible claim for

habeas relief 'by arguing that trial counsel did not effectively communicate the government's plea offer because of a language barrier'" (quoting *Diaz v. United States*, 633 F. App'x 551, 556 (2d Cir. 2015))). "When a defendant is clearly able to communicate in a given language, however, he cannot sustain claims protesting that his trial was unfair because of a language barrier." *Castillo v. United States*, No. 04-CR-408 (KMW), 2010 WL 3912788, at *3 (S.D.N.Y. Sept. 8, 2010).

Martinez-Guerrero contends Touger's failure to secure an interpreter for attorney-client meetings or court appearances was deficient because Martinez-Guerrero requested an interpreter and "only know[s] a little English." Doc. 281-1 at 10–12. He asserts that, because of this failure, he did not understand the terms or consequences of his plea or the related court proceedings. *Id.*; Doc. 285 at 24–25.

However, Martinez-Guerrero's contention that he requested an interpreter because he only understands "a little English" is plainly belied by the record, which shows that he has not only capably communicated in English throughout these proceedings—but also repeatedly eschewed interpretative assistance when it was offered to him. That includes the videos of his post-arrest interviews with state and federal law enforcement, which the Court reviewed very closely and which Martinez-Guerrero overwhelmingly conducted without the assistance of an interpreter—even though one was present and available to him. *See* Docs. 309-1, 309-2. Indeed, although Martinez-Guerrero initially used an interpreter during his interview with state law enforcement officers, approximately halfway through that interview, he began responding to the officers' English-language questions in a mix of English and Spanish—and did so before the interpreter could translate the officers' questions. Doc. 309-1 at 53:48–1:07:18. And, for the last thirty-five minutes of that interview, he then responded to the officers' questions regarding his criminal conduct and co-conspirators almost entirely in English. *Id.* at 1:16:45–42:00. Similarly, when Martinez-Guerrero was interviewed by federal law enforcement several months later, he responded to the officers' questions before they could be translated by

the interpreter and did so almost exclusively in English. Doc. 309-2 at 3:57–53:00. To be sure, in both interviews, Martinez-Guerrero's English was heavily accented, and, at times, he lapsed into Spanish when speaking directly to another arrestee or seeking to clarify a point with the interpreter. But on the whole, he demonstrated that he not only understood the officers' questions without the use of an interpreter, but was also able to provide detailed responses—in full sentences with proper grammar and syntax—in English.

Martinez-Guerrero's need for an interpreter is also contradicted by the record of his participation in these proceedings. For example, Martinez-Guerrero expressly declined interpretative assistance during his very first appearance in this case:

> THE COURT: Good afternoon. Mr. Martinez-Guerrero, are you able to speak and understand English?
>
> [MARTINEZ-GUERRERO]: Yes.
>
> THE COURT: Okay. I had originally been informed that you needed an interpreter. I just want to make sure that you're comfortable proceeding without an interpreter. Are you okay, and do you understand English well enough to proceed without an interpreter?
>
> [MARTINEZ-GUERRERO]: Yes.

Doc. 284-1 at 4. And, consistent with this representation, Touger then affirmed in open court that he "had a complete interview with [Martinez-Guerrero] in English" and that "[i]t was no problem." *Id.* at 5. In subsequent appearances before this Court—including his plea hearing—Martinez-Guerrero also answered the Court's questions appropriately without the assistance of an interpreter. *See, e.g.*, Doc. 284-3 at 5–6, 14–26. And Martinez-Guerrero's pre-sentence interview was also conducted in English, without the aid of a translator. Doc. 313-1 at 2. Thus, the record clearly shows that Martinez-Guerrero is not only capable of understanding and communicating in English, but also repeatedly opted to do so rather than use the services of an interpreter.

These facts are also corroborated by Touger's detailed affidavit, which the Court finds credible. There, Touger explained that although he offered to have his paralegal

serve as an interpreter for their conversations, Martinez-Guerrero instead chose to communicate with Touger in English. Doc. 308 at 1. And, consistent with the record described above, Touger "never once noticed" that Martinez-Guerrero had "any difficulty" in following these conversations and instead reflected his understanding through asking "very pertinent questions" and making "on point" comments during their conversations. Doc. 308 at 1–2. And nothing in Martinez-Guerrero's affidavit contradicts these assertions. Against this backdrop, Martinez-Guerrero's contention that he requested or needed an interpreter to consult with counsel or understand the court proceedings is simply not credible.[2]

In resisting this conclusion, Martinez-Guerrero highlights that an interpreter was present during his proffer with the government. Doc. 285 at 26. Notably, however, Martinez-Guerrero does not assert that he actually *used* the interpreter during this session. Doc. 281-1 at 10. And according to an FBI officer that was present at the proffer, Martinez-Guerrero not only "spoke primarily in English" during this session but largely eschewed use of the interpreter, instead answering the prosecutors' questions in English before the interpreter could translate them into Spanish. Doc. 309-5 at 2–3. And Martinez-Guerrero apparently took this approach even though the prosecutors had specifically requested that he pause before answering their questions to allow the interpreter to translate. *Id.* at 3. Thus, the presence of the interpreter at the proffer does not undermine the Court's finding that Martinez-Guerrero understands and can communicate effectively in English—and chose to do so in his conversations with Touger and court proceedings rather than request an interpreter.

The Court also rejects Martinez-Guerrero's specific contention that, "[w]ithout an interpreter, he could not understand the rights he was waiving, the terms of the plea agreement, or the consequences of his guilty plea." Doc. 285 at 25. The Court notes, as

---

[2] For this reason, the Court also finds that Touger's representation at sentencing that Martinez-Guerrero could address the Court without an interpreter was not objectively unreasonable.

an initial matter, that this contention is directly contradicted by Martinez-Guerrero's sworn statements during his plea hearing, which are entitled to a "strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 73–74 (1977). Specifically, during the plea hearing, the Court and Martinez-Guerrero engaged in the following exchange:

> THE COURT: Mr. Martinez, are you a United States citizen?
>
> [MARTINEZ-GUERRERO]: No, your Honor.
>
> THE COURT: What country are you a citizen of?
>
> [MARTINEZ-GUERRERO]: Honduras.
>
> . . .
>
> THE COURT: And have you spoken with your lawyer about the possible immigration consequences of entering a plea of guilty?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: Has Mr. Touger advised you as to the possible immigration consequences of your plea?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: So do you understand that there could be adverse immigration consequences, including possible deportation, as a result of your plea?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor. I understand.
>
> THE COURT: And do you understand that if there are adverse immigration consequences as a result of your plea, you will not be able to withdraw your plea or appeal or otherwise challenge your conviction on the basis of those consequences?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: Do you understand that there is a likelihood that you will be deported from the United States after you serve out your sentence?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: OK. Now, the next series of questions we need to go over concern your agreement with the government. I have been provided with a letter. It is dated November 15, 2024, and addressed to Mr. Touger. It's a seven-page letter, and there are a series of signatures on page 7, including one signature that purports to be your signature, so I'm going to hold this up. Can you see that from where you are seated?
>
> [MARTINEZ-GUERRERO]: Yeah.

> THE COURT: Is that your signature on this page?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: . . . Now, did you read this letter, Mr. Martinez, or was it read to you before you signed it?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: Did you discuss it with your attorney before you signed it?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.
>
> THE COURT: Did you fully understand the agreement when you signed it?
>
> [MARTINEZ-GUERRERO]: Yes.
>
> . . .
>
> THE COURT: And Mr. Martinez, have you clearly understood everything that has happened here today so far?
>
> [MARTINEZ-GUERRERO]: Yes, your Honor.

Doc. 284-3 at 14–15, 19–20, 23. And although the plea hearing was conducted in English, the record clearly shows that Martinez-Guerrero could proceed in that manner—and, in fact, declined interpretative assistance on multiple occasions, including in court proceedings—for the reasons already explained. Nor does Martinez-Guerrero's suggestion that he needed an interpreter to understand "technical legal concepts" suggest otherwise. Doc. 285 at 24. Indeed, even if that were true, the Court's questions regarding Martinez-Guerrero's knowledge of the plea and its consequences did not rely on any complex concepts: the Court asked Martinez-Guerrero, in straightforward terms, whether he: had read the agreement or had it read to him, discussed the agreement with his attorney, fully understood the agreement before signing it, understood that he was likely to be deported after his sentence, and "clearly understood everything that ha[d] happened here today so far." Doc. 284-3 at 15, 20, 23. And, given what the record shows about Martinez-Guerrero's English-language ability, he was clearly capable of understanding these questions. Thus, Martinez-Guerrero's present contention that his

language barrier prevented him from understanding the plea agreement or its consequences is contradicted by his own sworn statements.

These sworn statements are also, once again, corroborated by Touger's detailed and credible affidavit. There, Touger explains that he thoroughly reviewed each paragraph of the plea agreement with Martinez-Guerrero; explained the relative risks and benefits of pleading guilty, including for his immigration status; and offered his assessment that the plea "was best for achieving [Martinez-Guerrero's] goal of doing the smallest amount of prison time and possibly maintain[ing] his presence here in the United States." Doc. 308 at 2–3. During those discussions, Martinez-Guerrero responded with questions and comments that indicated his understanding of its terms. *Id.* And, only after these conversations did Martinez-Guerrero agree to sign the plea agreement. *Id.* To the extent that Martinez-Guerrero now seeks to contradict these assertions, the Court finds that his allegations are not credible considering these aspects of the record. *See Blackledge*, 431 U.S. at 73–74 (explaining that the "strong presumption of verity" that applies to sworn statements in court is not rebutted by "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are wholly incredible").

In resisting this conclusion, Martinez-Guerrero makes much of the fact that, during his plea hearing, he stated that he only knows how to read and write a "little bit" of English and later struggled to read a prepared statement. Doc. 285 at 25–26. But Martinez-Guerrero swore under oath that he had either read the plea agreement or had it read to him, discussed the agreement with his attorney, and fully understood its terms and consequences—including the "likelihood" that he would be deported after he served his sentence. *Id.* at 15, 20. Thus, regardless of whether he personally read the agreement or had it read to him, his decision to enter the plea was knowing and voluntary. *See e.g.*, *Reneau v. United States*, No. 01 Cr. 965-4 (SHS), 2006 WL 3019762, at *4 (S.D.N.Y. Oct. 20, 2006) (finding plea was knowing and voluntary where the defendant, "who

[could not] read or write, confirmed that the plea agreement had been read to him and that he had understood and signed the plea agreement”).

Martinez-Guerrero also offers affidavits from his girlfriend, Shamisha Jones; immigration attorney, Nora Searle; and habeas attorney, Eva L. Lilienfeld, in which they opine that he could not have understood the plea agreement or legal advice without an interpreter. *See* Docs. 232, 234, 238. But the best evidence of whether Martinez-Guerrero needed an interpreter to understand the proceedings is his own contemporaneous response to that question. And, during his post-arrest interviews, proffer, presentment, and attorney-client meetings, he repeatedly declined interpretative assistance. He also swore in open court that he had been read and fully understood his plea agreement, without indicating that he needed an interpreter. Thus, Jones’s, Searle’s, and Lilienfeld’s contrary opinions are not persuasive. That is especially true given that Jones, in particular, is not a disinterested witness. And, insofar as Searle’s and Lilienfeld’s opinions are premised on their post-plea conversations with him, the Court notes that, at that point, it was in Martinez-Guerrero’s self-interest to represent to others that he could not understand the plea, so that he could potentially avoid its negative consequences.[3] *Cf. United States v. Vargas*, 871 F. Supp. 623, 625 (S.D.N.Y. 1994) (denying a § 2255 motion based on the lack of interpretative assistance where there “was no indication that [the defendant] raised the question with his attorney” because “[i]f such a strategy were to be permitted to succeed, there would be every incentive for one not fluent in English to avoid mention of the language barrier until conviction, and then to raise it for the first time”).

In a final effort to salvage his claim, Martinez-Guerrero argues that he should not be bound by his representations at the plea hearing because “without an interpreter, he

[3] To be sure, Searle’s contention that Martinez-Guerrero’s “limited English proficiency makes Spanish-language advice necessary to provide effective counsel” is based on her interactions with him over the last six years. Doc. 283 at 1. But her assertion that “he did not fully understand the plea agreement that he had entered into” was premised on her “conversations with [him] after his guilty plea and sentencing.” *Id.* at 6.

relied on Mr. Touger's instructions to tell him whether to answer 'yes' or 'no' to the judge's questions." Doc. 314 at 9. But Martinez-Guerrero took an oath to respond truthfully to the Court's questions at the plea proceeding. And he does not argue that he did not understand that oath, which was relayed in plain English.[4] Nor does he argue that his decision to disregard that oath was prompted by anything other than his own strategic decision-making.[5] Thus, his assertion that he was following Touger's instructions is, in essence, an admission that he knowingly lied to this Court—and a request that the Court bless that practice by permitting him to vacate his plea. But that request is untenable for obvious reasons.

In sum, Martinez-Guerrero has not shown that he needed an interpreter to understand or participate in these proceedings, especially given his repeated rejection of interpretative assistance in his interactions with the government, conversations with counsel, and statements in court. In fact, the record demonstrates that Martinez-Guerrero communicated effectively in English about the charges and evidence against him as well as the terms and consequences of his plea and disclaimed a need for interpretative assistance during attorney-client conversations and court proceedings. Thus, Touger's failure to secure an interpreter was objectively reasonable.

*2. Failure to Secure Translated Copies of Court Documents*

Martinez-Guerrero also argues that Touger should have provided him with written translations of the plea agreement "and other critical court documents." Doc. 285 at 28. In support of his contention that he is entitled these translations, he relies on two cases: *United States v. Mosquera*, 816 F. Supp. 168 (E.D.N.Y. 1993), and *United States v. Nissim*, No. 92 Cr. 425 (LMM), 1994 WL 10624 (S.D.N.Y. Jan. 10, 1994). He contends that "[a]fter *Mosquera* and *Nissim*, counsel practicing in this District were on clear notice

[4] Nor would any such contention be credible, given what the record shows about his English-language ability.

[5] Martinez-Guerrero certainly does not argue that Touger suggested that he lie under oath.

that non-English-speaking defendants are entitled to written translations of plea agreements and other critical documents." Doc. 285 at 29.

Of course, insofar as those decisions were issued by other district courts, neither of them is binding on this court. The cases are also distinguishable insofar as neither of them involved an ineffective assistance claim. In any event, the Court is not persuaded that either case supports Martinez-Guerrero's claim here.

*United States v. Mosquera* involved "related complex cases alleging narcotics and money-laundering offenses," in which each of the eighteen defendants required interpreters. 816 F. Supp. at 170. And, on those facts, the court did order that the defendants be provided with written translations of their plea agreements, indictments, and pre-sentence reports. *Id.* at 178. But courts have since characterized *Mosquera* as "exceptional" and accordingly limited it to its facts. *Sanders v. United States*, 130 F. Supp. 2d 447, 449 (S.D.N.Y. 2001) (collecting cases); *see also United States v. Gonzales*, 339 F.3d 725, 729 (8th Cir. 2003) ("*Mosquera* does not stand for the proposition that criminal defendants enjoy a constitutional right to written translations of court documents. Rather, a court may decide to provide written translations in difficult and complicated cases."); *United States v. Celis*, 608 F.3d 818 (D.C. Cir. 2010) (same); *Cheng Chui Ping v. Willingham*, 746 F. Supp. 2d 496, 500 (S.D.N.Y. 2010) ("[T]here is no constitutional requirement that all written documents be provided in the defendant's native language . . . ."). Here, by contrast, the charges against Martinez-Guerrero are far less complex. And unlike the defendants in *Mosquera*, Martinez-Guerrero has demonstrated that he is capable of effectively communicating in English regarding the charges against him, his plea agreement, and these proceedings. *See Elize v. United States*, No. 02-CV-1350 (NGG), 2008 WL 4425286, at *8 (E.D.N.Y. Sept. 30, 2008) (rejecting an ineffective assistance claim based on the lack of written translations on similar grounds). Thus, when Martinez-Guerrero entered his plea, he had "adequate

notice . . . of the charges against him and the consequences of entering a plea of guilty," which is all that due process requires. *Sanders*, 130 F. Supp. 2d at 449.

Nor does *United States v. Nissim* help Martinez-Guerrero's case. Contrary to Martinez-Guerrero's assertions, *Nissim* did not hold that criminal defendants are generally entitled to written translations of court documents—or even that the defendant in that case was entitled to written translations. The court simply held that because the record "suggested" that there was a "possibility" that the defendant was not fully aware of the consequences of his guilty plea—and the court failed to ask the defendant whether he needed an interpreter—those circumstances supported the defendant's withdrawal of his plea in that case. *Nissim*, 1994 WL 10624, at *1. To be sure, the record in *Nissim* included an affidavit in which the defendant affirmed that he had not received translations of the plea agreement, indictment, or complaint. *Id.* But nothing in the court's reasoning suggests that its conclusion turned on this aspect of the affidavit, rather than its decision to credit the defendant's assertions that his "understanding of English," including spoken English, "was very limited at the time of [his] plea." *Id.* Indeed, even the defendant in that case did not stake his claim on the absence of written translations: he also noted that the plea agreement had not been read to him in English or his native language and argued that he could not understand everything that was said to him during his plea hearing. *Id.*

Here, by contrast, the record shows that Touger read and reviewed the plea agreement in detail with Martinez-Guerrero and discussed the immigration consequences of his plea at length.[6] And he agreed to enter the plea after considering Touger's advice regarding the advantages and risks of that decision. Thus, there is no reason to believe that, because he lacked a written translation of the agreement, he was unable to

---

[6] Although Martinez-Guerrero does not focus on the indictment or evidence against him in his motion, the Court also notes that Touger conducted a detailed review of these aspects of his case as well. Doc. 308 at 1–2. And when the government recounted the elements of the offense and the evidence that it intended to use to prove them at the plea hearing, Martinez-Guerrero affirmed that he understood the government's statements. Doc. 284-3 at 9–12, 21–23.

understand the case against him or the terms and consequences of his plea. Martinez-Guerrero has therefore not shown that Touger's failure to secure written translations of any court documents was deficient.

*3. Advice Regarding the Immigration Consequences of the Plea*

Martinez-Guerrero's final claim is premised on Touger's alleged failure to accurately advise him of the immigration consequences of his guilty plea. In general, the Sixth Amendment requires defense counsel to inform his client whether a guilty plea carries a risk of deportation. *Farhane v. United States*, 121 F.4th 353, 364 (2d Cir. 2024). When a guilty plea would make deportation presumptively mandatory, and that consequence can "easily be determined from reading the removal statute," a defense counsel's "false assurance that [his client's] conviction would not result in his removal from this country" is objectively unreasonable. *Padilla v. Kentucky*, 559 U.S. 356, 368 (2010). However, "[w]hen the law is not succinct and straightforward[,] . . . a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Id.* at 369.

Martinez-Guerrero contends that Touger violated this mandate because he did not explain to him that his guilty plea made his deportation presumptively mandatory and instead told him "not to worry about" the immigration consequences of his guilty plea. Doc. 285 at 22; Doc. 281-1 at 4–5. But here, again, his assertions are not credible for several reasons.

For one, Touger's detailed and credible affidavit contradicts Martinez-Guerreros's conclusory and self-serving account. Indeed, Touger not only categorically denies ever telling Martinez-Guerrero not to worry about the immigration consequences of his plea, but also asserts that he "continually spoke with [Martinez-Guerrero] about the threat that this case posed to his immigration situation," including "the risks of being found guilty of the charges pending against him." Doc. 308 at 3. For example, Touger asserts that he "reviewed the plea agreement in detail with" Martinez-Guerrero and "went over every

paragraph of the plea agreement and the potential consequences of the plea." Doc. 308 at 2. He contends that this included a "detailed conversation" with Martinez-Guerreo "about the pros and cons" of pleading guilty, including regarding immigration status. *Id.*

Touger also asserts that, based on his conversations with multiple immigration attorneys, it had become clear to him that for Martinez-Guerrero to "have a chance to preserve his presence here in the United States[,] he needed most importantly to be convicted of a non-violent crime and be sentenced to less than one year in prison." *Id.* at 1. And Martinez-Guerrero concedes that this interpretation is correct. *See* Doc. 314 at 12. Indeed, a noncitizen who is convicted of an "aggravated felony" is subject to presumptively mandatory detention, and a theft offense constitutes an "aggravated felony" only if the "term of imprisonment [is] at least one year." 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(G). Consistent with this understanding, Touger explained to Martinez-Guerrero that "the plea gave him the opportunity to receive a sentence of less than one year, which would then give him the possibility of prevailing in his [i]mmigration proceedings"; "there were no guarantees that he was going to get less than a year as a sentence especially considering the problems he had had while out on bail"; "he could not get his plea back if it turned out he received a sentence of more than one year"; and "he was waiving his right to appeal if he received a sentence in the Guideline range or less." Doc. 308 at 2.

Touger further asserts that he explained to Martinez-Guerrero that "although he was taking the risk that he would receive a sentence of greater than one year, this risk was worth taking because his only other choice was to proceed to trial and his chances of winning a not guilty verdict at trial were quite small." *Id.* at 3. Thus, Touger explained to Martinez-Guerrero that accepting the guilty plea was his best chance at reducing his prison sentence and thus potentially reducing his risk of deportation. *Id.*

Touger's account is also corroborated by the declaration of Martinez-Guerrero's immigration attorney, Nora Searle. There, Searle asserts that on November 20, 2024—

*i.e.*, a month before Martinez-Guerrero signed the plea agreement—she asked Touger if any immigration counsel had advised Martinez-Guerrero that a plea would make him deportable and "likely subject him to mandatory [ICE] detention." Doc. 283 at 4–5. According to Searle, Touger responded "that 'he' thought if [Martinez-Guerrero] received a sentence of less than one year, [Martinez-Guerrero] would have a possibility of remaining in the country." Doc. 283 at 4–5. Searle understood that the "he" in this response referred to Martinez-Guerrero, and thus that Touger was recounting Martinez-Guerrero's beliefs about the consequences of his plea, rather than the advice of Touger's immigration counsel.[7] *Id.* at 5. But the fact that Martinez-Guerrero believed that a sentence of less than year would provide the "possibility of remaining in the country" suggests that Touger did, in fact, warn Martinez-Guerrero that a guilty plea would subject him to mandatory deportation unless he received a sentence of less than one year. Thus, Searle's recollection of this conversation corroborates Touger's account.

Finally, as the Court has noted, Martinez-Guerrero's assertion that Touger told him not to worry about the immigration consequences of his plea are contradicted by his sworn representations to the Court. *See* Doc. 284-3 at 15, 20. Because the Court has already found that Martinez-Guerrero could understand and respond to these questions without an interpreter, it is entitled to rely on these sworn representations. *See United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001) (collecting cases).

In sum, the Court finds Martinez-Guerrero's assertion that Touger told him not to worry about the immigration consequences of his guilty plea not credible. Rather, the record—including Touger's detailed declaration, Searle's account of her pre-plea

[7] Because Searle asserts that the "he" in Touger's response referred to Martinez-Guerrero, she argues that Touger did not answer her question about whether immigration counsel had advised Martinez-Guerrero about the deportation consequences of his plea. Doc. 283 at 5. However, Searle does not explain why she believes that the "he" referred to Martinez-Guerrero, rather than Touger's immigration counsel—or provide the full text of the written exchange. Thus, based on the record before the Court, it seems equally plausible that the Touger was merely relaying the advice that his immigration counsel provided to Martinez-Guerrero—and therefore answering Searle's question.

interactions with Touger, and Martinez-Guerrero's own sworn statements—establishes that Touger not only read and explained each provision of the plea agreement to Martinez-Guerrero, but also accurately informed him that a guilty plea would subject him to deportation unless he received a sentence of less than a year. And the record shows that Martinez-Guerrero understood this consequence and entered the plea to reduce his chance of a sentence that would trigger deportation. Martinez-Guerrero's vague and self-serving allegations to the contrary are not credible. *See Puglisi*, 586 F.3d at 214 (explaining that in a § 2255 case, "a district court need not assume the credibility of factual assertions, as it would in civil cases, where the assertions are contradicted by the record in the underlying proceeding"). The Court therefore finds that Touger accurately warned Martinez-Guerrero about the immigration consequences of his guilty plea, and thus that his performance was constitutionally sufficient.

**B. Prejudice**

Even if Touger's representation was deficient—which it was not—Martinez-Guerrero's claims would fail because he has not shown that he was prejudiced by any alleged error. This is true for several reasons.

First, to the extent that Martinez-Guerrero alleges that he was misinformed about the consequences of his guilty plea, any misimpression was corrected by the Court's warnings to him during his plea hearing. Indeed, "[b]ecause statements of the trial judge constitute a 'formidable barrier' to an ineffective assistance claim raised in a collateral proceeding and because trial courts are afforded latitude to advise defendants of their Sixth Amendment rights," courts in this District have found that a "court's advice of rights relating to the immigration consequences of a guilty plea can cure any failing of defense counsel." *Whyte v. United States*, No. 08-CR-1330 (VEC), 2015 WL 4660904, at *9 (S.D.N.Y. Aug. 6, 2015) (quoting *Blackledge*, 431 U.S. at 74). Here, the Court explicitly asked Martinez-Guerrero whether he understood that that "there could be adverse immigration consequences, including possible deportation, as a result of [his]

plea," and that "there [was] a likelihood that [he] will be deported from the United States after" he completed his sentence. Doc. 284-3 at 15. And Martinez-Guerrero answered that he understood these potential consequences.[8] *Id.*

Although Martinez-Guerrero concedes that "[s]pecific warnings by a court about deportation can, at times, be sufficient to put a defendant on notice of immigration consequences," he contends that the Court's warnings in this case were insufficient for two reasons. Doc. 285 at 22–23. First, he argues that he was unable to "fully understand" the Court's warnings given his "limited English." *Id.* at 23. But, for the reasons already explained, the Court does not find this assertion credible, especially given the plain nature of the Court's warning. Martinez-Guerrero also argues that the warnings did not put him on notice of the immigration consequences of his plea because they "did not specifically advise [him] that [he] would be subject to mandatory deportation," but rather "explicitly contemplated both deportation and non-deportation scenarios." *Id.* However, as the Court has explained, there *was* a chance that Martinez-Guerrero's guilty plea would not subject him to mandatory detention: if he was sentenced to less than one year in prison, then his theft offense would not be considered an aggravated felony under the mandatory deportation statute. Thus, Martinez-Guerrero's reliance on *United States v. Ferrera*, which involved an offense that categorically resulted in mandatory deportation regardless of the sentence imposed, is misplaced.[9] *United States v. Ferrera*, No. 10-CR-

[8] The Court also notes that a substantively identical warning was contained in the plea agreement, which Martinez-Guerrero swore that he read or had read to him, discussed with his attorney, and fully understood before signing. *See* Doc. 284-2 at 7.

[9] *Ferrera* is also inapposite insofar as defense counsel in that case told his client that immigration issues would "not be a problem" because of the "long-standing track record of the U.S. Government not deporting Cuban nationals." *Ferrera*, 2020 WL 7342673, at *3–4. Here, by contrast, the Court has found that Touger did not make an analogous statement. Nor are there any circumstances, like the longstanding policy at issue in *Ferrera*, that would suggest to Martinez-Guerrero that he would be the exception to the Court's warning that deportation was likely. *See id.* at *6 (explaining that the defendant "reasonably may have understood that, as a Cuban national, he was the exception to the rule that made deportation 'very likely' but not certain," because "[a]t the time of [his] conviction, the United States was not deporting Cubans in large numbers, and [he] was very much aware of that fact"). Indeed, federal agents warned him that this case would "affect" his "papers" and that ICE had already lodged a detainer against him during his post-arrest interview. Doc. 309-2 at 52:10.

892 (VEC), 2020 WL 7342673, at *5–7 (S.D.N.Y. Dec. 14, 2020); *compare* 8 U.S.C. § 1101(a)(43)(B) (including "illicit trafficking in a controlled substance" in the definition of "aggravated felony," without reference to the sentence imposed), *with* 8 U.S.C. § 1101(a)(43)(G) (specifying that an "aggravated felony" includes "a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment [is] least one year"). Here, there was a possibility that Martinez-Guerrero's guilty plea would not subject him to mandatory deportation; thus, the Court's advice was not inaccurate.[10]

In any event, Martinez-Guerrero has not shown that, but for Touger's alleged errors, there was reasonable probability that he either (1) could have negotiated a plea that did not impact his immigration status or (2) would have rejected the plea and insisted on going to trial. *Farhane*, 121 F.4th at 376.

To satisfy the first ground, Martinez-Guerrero must "demonstrate a reasonable probability that the prosecution would have accepted, and the court would have approved, a deal that had no adverse effect on [his] immigration status." *Kovacs*, 744 F.3d at 52. Martinez-Guerrero argues that Touger could have negotiated a more favorable plea by focusing on his immigration concerns during plea negotiations. Doc. 285 at 32. In support of this contention, he suggests that Touger failed to discuss the consequences of his guilty plea on his immigration status during plea negotiations. *Id.* But here, again, the record refutes Martinez-Guerrero's claim. Touger explains that immigration consequences were the "focal point" of plea negotiations: Touger contacted the lead prosecutor to discuss a plea agreement that would enable Martinez-Guerrero to remain in the United States, but the government refused to further negotiate its terms, even after Touger explained Martinez-Guerrero's immigration situation. Doc. 308 at 2–3. In

---

[10] At the very least, the question of whether the entry of a guilty plea under these specific circumstances would subject Martinez-Guerrero to deportation is not "succinct and straightforward." *Padilla*, 559 U.S. at 368. Thus, the only advice to which he was entitled was a warning that his plea "may carry a risk of adverse immigration consequences." *Id.* And the Court's warning plainly satisfied that requirement.

Touger's words, "[t]he plea agreement was a take or not situation." *Id.* at 3. In her declaration, Searle corroborates this account. *See* Doc. 283 at 3 ("On November 4, 2024, Mr. Touger informed me that the prosecution was taking a hard line . . . ."); *id.* at 4 (explaining that Touger indicated to her "that the prosecution would not budge" and "that it was either accept the plea or go to trial"). Thus, Martinez-Guerrero's assertion that Touger failed to advocate for a plea that would avoid deportation is not credible.[11]

More fundamentally, Martinez-Guerrero does not identify any alternative crime to which he might have pleaded that would have, in fact, avoided the immigration consequences he now faces. And even if he did, he has not shown that the government would have offered a plea to any charge other than the conspiracy charge that he ultimately accepted. Indeed, of nine defendants that were charged in case, eight have pleaded guilty, and each of these pleas included the same charge.[12] And, importantly, the government considered Martinez-Guerrero "the second-most culpable defendant in this case." Doc. 150 at 2. Thus, Martinez-Guerrero's contention that Touger could have negotiated a plea to a charge that would have avoided immigration consequences is not plausible.[13]

---

[11] In resisting this conclusion, Martinez-Guerrero notes that, at sentencing, the government expressed that it was "confused" about Touger's suggestion that a sentence of less than a year would provide his client with the opportunity to avoid deportation and disqualification from his pending petitions for immigration relief, because Touger did not cite any legal authority for that proposition and Searle did not refer that "bright-line rule" in her sentencing submission. Doc. 284-5 at 11–12. But the government went on to state that, even if that "bright-line rule" applied, Martinez-Guerrero should still be sentenced to a term of imprisonment that would subject him to deportation and "automatically disqualify[] [him] from favorable action on his pending petitions." *Id.* Thus, the government's statements at sentencing corroborate Touger's claim that the government refused to negotiate a plea that would avoid the adverse immigration consequences that Martinez-Guerrero now faces.

[12] The case against the ninth defendant remains open because he participated in the Young Adult Opportunity Program. Docs. 87–88.

[13] In his reply, Martinez-Guerrero argues that even if the government would not have allowed him to plea to a different charge, it might have stipulated to a lesser sentence. Doc. 314 at 12. But that assertion is belied by Touger's credible testimony that the "plea agreement was a take or not situation." Doc. 308 at 3. And even if the government agreed to recommend a lesser sentence, the government's recommendation would not have been binding on this Court. Thus, the potential immigration consequences of the plea would have been the same.

Nor has Martinez-Guerrero shown that there was a reasonable probability that he would have rejected the plea and insisted on going to trial. To make this showing, a petitioner can either show that he would have: (1) litigated a "viable and sufficiently promising" defense to avoid deportation, *Kovacs*, 744 F.3d at 52, or (2) "rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a 'Hail Mary' at trial," *Lee*, 582 U.S. at 367–68.

As the Supreme Court and Second Circuit have explained, the crux of this inquiry is not whether the defendant ultimately would have prevailed at trial. *Kovacs*, 744 F.3d at 53 ("[T]he question is not whether the defense would ultimately have been successful."); *Lee*, 582 U.S. at 367 (explaining that although a "defendant without any viable defense . . . will rarely be able to show prejudice from accepting a guilty plea that offers him a better resolution than would be likely after trial," when evaluating prejudice "there is more to consider than simply the likelihood of success at trial"). Rather, "the inquiry focuses on the defendant's decision-making process," including his assessment of the "'respective consequences of a conviction after trial and by plea.'" *Doe v. United States*, 915 F.3d 905, 914 (2d Cir. 2019) (quoting *Lee*, 582 U.S. at 367). But, in evaluating whether a defendant would have gone to trial, courts cannot rely solely on "*post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies." *Lee*, 582 U.S. at 369. Rather, courts must "look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Id.*

Here, Martinez-Guerrero does not argue that there was any defense that was available to him that he would have litigated at trial. Indeed, he does not appear to dispute that the evidence against him was overwhelming. Thus, he has not shown that there was a reasonable probability that he would have opted for trial on that ground.

Nor has Martinez-Guerrero shown that he would have gone for the "Hail Mary." *Lee*, 582 U.S. at 368. To be sure, in his declaration, he asserts that, if he had "known that pleading guilty could result in mandatory deportation, [he] would have decided to go to

trial," and that "[h]aving a chance to stay in the United States would have been more important to me than any other consequence, including any amount of time in prison or probation." Doc. 281-1 at 5. But he does not identify any contemporaneous evidence to support that *post hoc* assertion, other than his testimony that he asked Touger about the immigration consequences of his guilty plea and feared returning to his home country. *See, e.g.*, *Lee*, 582 U.S. at 369–71 (finding that the defendant would have rationally opted for trial based on his attorney's undisputed testimony that the defendant "would have gone to trial if he had known about the deportation consequences," the defendant's expressions of concern regarding deportation at his plea hearing, the defendant's "strong connections to this country and no other," and the fact that the "consequences of taking a chance at trial were not markedly harsher than pleading" guilty). The Court does not minimize Martinez-Guerrero's concerns about his safety in Honduras—or doubt that those concerns were on his mind when he was considering whether to plead guilty. But the record shows that Martinez-Guerrero weighed this risk before entering his plea—and decided that the plea was his best chance at avoiding deportation. In this respect, it bears repeating that Martinez-Guerrero expressed no confusion or concern about the Court's warning that his plea would likely result in deportation. Without more, the Court cannot say that this is one of the "unusual circumstances" in which a defendant who lacks a viable defense "has adequately demonstrated a reasonable probability that he would have rejected the plea had he known that it would lead to mandatory deportation." *Id.* at 369.

## IV. CONCLUSION

For the reasons set forth above, the motion is DENIED. And because the only assertions that could support Martinez-Guerrero's claim are "palpably incredible," his request for an evidentiary hearing is denied. *Gonzalez v. United States*, 722 F.3d 118, 130–31 (2d Cir. 2013); *see also Puglisi*, 586 F.3d at 214 ("[W]hen the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than full-

fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner.”).

The Clerk of the Court is respectfully directed to terminate the motions in the criminal case, Docs. 280, 303, 304, 311, and close the civil case.

It is SO ORDERED.

Dated: September 10, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.